**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **JEFFERY L. SNEED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:13-CV-00300** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Jeffery Sneed appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying his application under the Social

Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI").[1] (*See* Docket # 1.)  For the following reasons, the

Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Sneed applied for DIB and SSI on or about October 12, 2010, alleging disability as of

May 24, 2005. (Tr. 16.)  He was last insured for DIB on March 31, 2008. (Tr. 16, 156); *see*

*Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must

establish that he was disabled as of his date last insured in order to recover DIB benefits).

The Commissioner denied Sneed's application initially and upon reconsideration. (Tr.

82-102, 105-10.)  After a timely request, a hearing was held on April 10, 2012, before

Administrative Law Judge ("ALJ") Yvonne Stam, at which Sneed, who was represented by

---

[1] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

counsel; his girlfriend; and a vocational expert testified. (Tr. 37-73.) On July 13, 2012, the ALJ

rendered an unfavorable decision to Sneed, concluding that he was not disabled because he could

perform a significant number of jobs in the economy despite the limitations caused by his

impairments. (Tr. 16-30.) The Appeals Council denied his request for review, at which point the

ALJ's decision became the final decision of the Commissioner. (Tr. 1-12, 270-71.)

In her decision, the ALJ observed that Sneed had previously applied for DIB and SSI in

January 2009, and that these applications were denied initially and upon reconsideration. (Tr. 16,

74-77.) She found that because Sneed alleged an onset date during a period that had already

been adjudicated, a request to reopen the prior applications was implied. (Tr. 16.) The ALJ

concluded, however, that Sneed had not submitted new or material evidence to support

reopening, and therefore, his 2009 applications would not be reopened. (Tr. 16.) The ALJ

further stated that because Sneed's DIB date last insured fell within the period already

adjudicated, he could not be found disabled for purposes of DIB, *see Stevenson*, 105 F.3d at

1154, and the earliest potential disability onset date for SSI would be his current application date

of October 12, 2010. (Tr. 18.)

Sneed filed a complaint with this Court on October 16, 2013, seeking relief from the

Commissioner's final decision. (Docket # 1.) In this appeal, Sneed asserts just one argument–

that the ALJ improperly evaluated a mental impairment questionnaire written by his treating

nurse practitioner, Karen Lothamer. (Opening Br. of Pl. in Social Security Appeal Pursuant to

L.R. 7.3 ("Opening Br.") 12-15.) Because Sneed does not challenge the ALJ's denial of his DIB

claim on the procedural basis explained above, he has waived any challenge with respect to DIB,

and therefore, only his SSI claim remains. *See generally Swanson v. Apfel*, No. IP 99-1159-C

2

H/G, 2000 WL 1206587, at *4 (S.D. Ind. Aug. 7, 2000) (acknowledging that a claimant waives

an argument by failing to raise it in his opening brief).

## II. FACTUAL BACKGROUND[2]

### A. Background

At the time of the ALJ's decision, Sneed was forty-three years old (Tr. 74); had a high

school education and two years of college (Tr. 188); and had work experience as a packager,

sander, and fry cook (Tr. 28, 269). He alleges that he became disabled due to degenerative disc

disease, diabetic neuropathy, asthma, and major depressive disorder. (Opening Br. 2.) Sneed

does not dispute the ALJ's findings on his physical impairments (Opening Br. 2 n.1); therefore,

the Court will focus on the evidence pertaining to his mental limitations.

### B. Sneed's Testimony at the Hearing

At the hearing, Sneed testified that he currently lives alone in an apartment. (Tr. 40.) His

daily routine includes taking his medications and checking his blood sugar, napping, walking

around the block for exercise, watching television, and preparing light meals (Tr. 45-48);

sometimes he has difficulty sleeping at night (Tr. 52-53). He took college classes in 2010 and

2011, attending eight hours a day, four days a week (Tr. 60); eventually, however, Sneed started

missing classes and then dropped out, citing back problems and medication side effects of

sleepiness, and if he took the medications too closely together, sweating and dizziness. (Tr. 44-

45, 58-60.) Sneed also stopped driving due to these medication side effects. (Tr. 44-45.)

As to his mental impairments, Sneed said that he always has had difficulty getting along

with coworkers and supervisors and has a "short-fuse temper." (Tr. 54-57.) He does not like to

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 775-page administrative record necessary to the decision.

be around people. (Tr. 61-62, 64.)  He also said that his mental problems caused him to be late

for work.[3] (Tr. 56.)

### C.  *Summary of the Relevant Medical Evidence*

In June 2008, Sneed was sent to Park Center by the Allen County Probation

Department after a positive test for marijuana. (Tr. 479-83.)  He was diagnosed with cannabis

dependence and assigned a Global Assessment of Functioning ("GAF") score of 58.[4] (Tr. 481.)

He then participated in approximately 23 substance abuse group therapy sessions. (Tr. 434-78,

485-535, 540-77.)  At these appointments, "current status" checks–which included appearance,

level of consciousness, mood, speech, attitude, behavior, psychotic symptoms, thought

content/thought process, hallucinations, activity level, orientation, and dangerousness–were all

normal. (Tr. 434-78, 485-535, 540-77.)

In February 2009, Candace Martin, Psy.D., conducted a mental status examination of

Sneed at the request of Social Security. (Tr. 293-97.)  She noted that he was homeless, had been

incarcerated, and had an extensive history of polysubstance abuse. (Tr. 296.)  Upon examination,

Sneed was well oriented and showed no evidence of a thought disorder; his mood appeared

normal to the situation with notable discouragement. (Tr. 294-95.)  His judgment, insight,

---

[3] Sneed's girlfriend, who has known him almost ten years, also testified at the hearing, essentially corroborating his testimony. (Tr. 62-65.)

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  And a GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

attention, concentration, and long-term and intermediate memory were all adequate; but his fund

of general information, short-term memory, and mentation were weak, and his abstract reasoning

poor. (Tr. 295-96.)  Dr. Martin wrote that Sneed's examination suggested that, despite his

education, he was functioning in the borderline to mildly-mentally handicapped range of

intelligence. (Tr. 296.)  She assigned him a GAF of 35 and diagnosed him with anxiety disorder

due to asthma; trichotillomania;[5] adjustment disorder with anxiety; polysubstance abuse, in

remission; and probable borderline intellectual functioning. (Tr. 296-97.)  She concluded that he

could likely "perform simple, routine, and repetitive work that provides for his physical

limitations." (Tr. 296.)

In December 2010, Ryan Oetting, Ph.D., completed a mental status examination of Sneed

at the request of Social Security. (Tr. 390-92.)  Sneed had no psychiatric treatment history except

for attending narcotics anonymous while in prison. (Tr. 390.)  He presented with a neutral affect

and a somewhat depressed, irritated mood; his thought processes appeared logical and

sequential, and his psychomotor activity normal. (Tr. 390.)  He denied experiencing

hallucinations or suicidal or homicidal ideation. (Tr. 392.)  Sneed reported excessive worrying,

feeling depressed every day and "worthless all the time," and irritability and poor concentration.

(Tr. 392.)  Dr. Oetting assigned a GAF of 53 and diagnosed Sneed with depressive disorder, not

otherwise specified ("NOS"); anxiety disorder NOS; and rule out borderline intellectual

functioning. (Tr. 392.)

In January 2011, Stacia Hill, Ph.D., a state agency psychologist, reviewed Sneed's record

---

[5] Trichotillomania is "[a] compulsion to pull out one's own hair." *Stedman's Medical Dictionary* 2031
(28th ed. 2006).

and completed a psychiatric review technique and mental residual functional capacity (" RFC")

assessment forms. (Tr. 400-415.) On the psychiatric review technique, Dr. Hill concluded that

Sneed had mild difficulties in activities of daily living and maintaining social functioning, but

moderate difficulties in maintaining concentration, persistence or pace. (Tr. 410.) On the mental

RFC assessment, Dr. Hill indicated that Sneed was moderately limited in his ability to carry out

detailed instructions, interact appropriately with the general public, and respond appropriately to

changes in the work setting; he was not significantly limited in the remaining seventeen mental

activities. (Tr. 413-14.) In her narrative summary, Dr. Hill wrote that Sneed's daily activities

appeared limited primarily by his physical conditions and that his attention and concentration

were moderately impacted, but still reasonable for semiskilled tasks. (Tr. 415.) She stated, in

sum:

> The evidence suggests that claimant can understand, remember, and carry out
> semiskilled tasks. The claimant can relate on at least a superficial basis on an
> ongoing basis with co-workers and supervisors. The claimant can attend to tasks
> for a sufficient period of time to complete tasks. The claimant can manage the
> stresses involved with semiskilled work.

(Tr. 415.) Dr. Hill's opinion was later affirmed by a second state agency psychologist, Donna

Unversaw, Ph.D. (Tr. 432.)

In June 2011, Sneed was referred to Park Center by the Wayne Township Trustee due to

symptoms of depression and anxiety. (Tr. 714-15.) At his intake evaluation, Sneed denied

having a drug or alcohol history. (Tr. 714.)

The following month, Sneed was evaluated by mental health counselor Michelle Jones at

Park Center, claiming symptoms of depression. (Tr. 706-13.) He reported suicidal ideation and

problems with sleep and self esteem. (Tr. 706.) He was looking for work, but had past problems

6

with aggressive behavior and attendance. (Tr. 708.) He had been in and out of prison for dealing

drugs and had child custody disputes; he was on probation at the time. (Tr. 708.) A mental status

examination revealed normal insight, judgment, mood, affect, memory, thinking form, and

thought content; he did, however, have mild to moderate problems with decision-making. (Tr.

709.) He had no difficulty managing finances, but was unable to manage time; he was fully

capable of independent living. (Tr. 710.) Ms. Jones concluded that although Sneed had been free

from alcohol or drug use in the last month, he had a moderate substance abuse problem that

needed treatment. (Tr. 710.) He was assigned a GAF of 58 and diagnoses of major depressive

disorder, recurrent moderate; and cannabis dependence. (Tr. 712.)

In August 2011, Karen Lothamer, a psychiatric nurse practitioner at Park Center,

evaluated Sneed.[6] (Tr. 698-700.) She wrote that he presented with depression, mood fluctuation,

agitation, anxiety, panic attacks, memory impairment, and sleep problems. (Tr. 698-99.) He

exhibited a sullen mood and flat affect, but his behavior was slow, calm, and cooperative. (Tr.

699.) Sneed had depressed and anxious thoughts and, at times, could not focus on tasks; yet, he

had fair insight and judgment. (Tr. 699.) His GAF score and diagnoses were the same as

assigned by Ms. Jones. (Tr. 699-700.) Ms. Lothamer prescribed Cymbalta and instructed Sneed

to return in one month. (Tr. 700.)

The following month, Sneed reported that Cymbalta had been somewhat helpful. (Tr.

683-87.) Ms. Lothamer observed that he was pleasant and cooperative, but had distractible

behavior, a flat affect, and depressed mood. (Tr. 683-84.) He had fair judgment and normal

---

[6] All of Ms. Lothamer's treatment notes were countersigned by Dr. Ronald Pancner. (Tr. 700, 687, 761, 768.)

thought content, no suicidal or homicidal ideation, and no difficulties with sleep, memory, or medication side effects. (Tr. 683-85.) She assessed that he was "[m]aintaining well and stable." (Tr. 685.)

In November, Sneed told Ms. Lothamer that Cymbalta had helped, but that he still had issues with anger. (Tr. 764.) He had a cooperative and detached attitude, distractible behavior, fair judgment, coherent thought form, and normal thought content; he reported no suicidal or homicidal ideation or memory problems. (Tr. 764-68.) She noted that he was "slightly worse" and added Trileptal to his medication regime. (Tr. 767.) In December, Sneed told Ms. Lothamer that he felt Trileptal had leveled his moods. (Tr. 757.) She observed that he had a cooperative, pleasant, and attentive attitude; normal mood but flat affect; appropriate behavior; coherent thought form and normal thought content; good and appropriate judgment; intact memory; and no suicidal or homicidal ideation. (Tr. 757-60.) She indicated that he was "[m]aintaining well and stable" and that his major stressors were his physical health issues. (Tr. 759-60.)

Sneed also saw Ms. Jones on a monthly basis for counseling from August 2011 through at least February 2012. (Tr. 672, 674-77, 679-82, 688-89, 746-47, 750, 769-70.) In August, he presented as somewhat depressed, stating that his uncle had died recently; he continued to struggle with homelessness. (Tr. 688-69.) A month later he again presented as somewhat depressed, and Ms. Jones worked with him on problem solving issues related to housing, probation, and employment. (Tr. 679-81.) In October, Ms. Jones indicated that Sneed was anxious, but had normal insight, judgment, mood, affect, thinking form and content; he was actively participating in therapy, but "showing limited progress." (Tr. 672, 675-76.)

In November, Ms. Jones wrote that Sneed presented as depressed, stating that he wanted

to work but could not; he had problems sleeping. (Tr. 769-70.)  By December, Sneed had

secured an apartment and furniture, but was concerned about his finances; he was sleeping

during the day and then finding it hard to sleep at night. (Tr. 761-62.)  In January 2012, Ms.

Jones documented that Sneed was somewhat depressed and had an irregular sleep schedule. (Tr.

750.)  In February, Ms. Jones and Sneed explored ways to manage his anxiety concerning

transportation and finances; he still had his days and nights mixed up. (Tr. 746-47.)

At a visit to his primary care physician, Dr. Hector Perez, in January 2012, Sneed denied

that he suffered depression, loss of sleep, or forgetfulness. (Tr. 718.)

In April 2012, Ms. Lothamer completed a mental impairment questionnaire

(countersigned by Dr. Vijoy Varma), indicating that she had reviewed the opinions of Drs.

Martin and Oetting. (Tr. 771-74.)  She listed Sneed's symptoms as depression, agitation, low self

esteem, and problems sleeping. (Tr. 771.)  She stated that his medications had helped reduce his

symptoms, but his social problems (including no permanent residence) were variable. (Tr. 772.)

She indicated that his mental difficulties, without any problems from substance abuse, would

cause him to be absent or tardy from work because of lack of focus, punctuality problems, and

limited mobility; specifically, she thought he would miss two days of work a month due to

mental illness. (773.)  She also found that he would have problems staying focused at work due

to depression and worry, and that he could focus on unskilled work less than 85% of the

workday. (Tr. 773-74.)

In May 2012, Ms. Jones penned a letter to Sneed's attorney, stating that she had been

counseling Sneed since August 2011. (Tr. 775.)  She stated that he had difficulty being around

people, "problems with sleep and feeling down," and at times presented as very withdrawn. (Tr.

9

775.)  She wrote that because he had only recently completed probation and monitoring, it was

not probable that his symptoms were in any way related to cannabis abuse. (Tr. 775.)

## III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted).  The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative

record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner

are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212

(7th Cir. 2003).  "In other words, so long as, in light of all the evidence, reasonable minds could

differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying

benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A).  A physical or mental

impairment is "an impairment that results from anatomical, physiological, or psychological

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[7] *See Dixon v.*

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920.  An

affirmative answer leads either to the next step or, on steps three and five, to a finding that the

claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).  A negative answer

at any point other than step three stops the inquiry and leads to a finding that the claimant is not

disabled. *Id.*  The burden of proof lies with the claimant at every step except the fifth, where it

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B.  The ALJ's Decision

On July 13, 2012, the ALJ issued the decision that ultimately became the

---

[7] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 416.920(e), 404.1545(a), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

Commissioner's final decision. (Tr. 16-30.)  She found at step one of the five-step analysis that

Sneed had not engaged in substantial gainful activity during the relevant period. (Tr. 18.)  A step

two, the ALJ concluded that Sneed had the following severe impairments: degenerative disc

disease, diabetic neuropathy, asthma, major depressive disorder, and a history of cannabis

dependence. (Tr. 19.)

The ALJ determined at step three, however, that Sneed's impairment or combination of

impairments were not severe enough to meet a listing. (Tr. 19-21.)  Before proceeding to step

four, the ALJ determined that Sneed's symptom testimony was not credible to the extent it

portrayed limitations in excess of the following RFC:

> [T]he claimant has the residual functional capacity to perform sedentary work . . .
> as follows: lift and carry 20 pounds occasionally and ten pounds frequent[ly] with
> no additional limitations on the claimant's ability to push or pull[]; stand/walk
> two hours in an eight-hour workday, and sit for six hours in an eight hour
> workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and
> stairs, balance, stoop, kneel, crouch, and crawl; must avoid concentrated exposure
> to hazards such as unprotected heights and unguarded machinery; brief and
> superficial contact with coworkers and supervisors; and no work with the general
> public.

(Tr. 21.)

Based on this RFC and the vocational expert's testimony, the ALJ concluded at step four

that Sneed was unable to perform any of his past relevant work. (Tr. 28.)  The ALJ then

concluded at step five that Sneed could perform a significant number of unskilled, sedentary jobs

within the economy, including packager, assembler, and inspector. (Tr. 29.)  Therefore, Sneed's

claim for disability benefits was denied. (Tr. 29-30.)

 C.  *The ALJ's Consideration of Ms. Lothamer's Opinion Is Supported by Substantial Evidence*

Sneed's sole argument on appeal is that the ALJ improperly discounted the mental

impairment questionnaire completed by Ms. Lothamer, his treating nurse practitioner, stating

that he would miss more than two days of work a month and could stay on task less than 85% of

a workday.  Sneed's argument, however, amounts to merely a plea to reweigh the evidence,

which the Court cannot do.

As background, the opinion of a nurse practitioner is not an "acceptable medical source"

under the Social Security regulations, but rather is considered an "other source." *Masch v.*

*Barnhart*, 406 F. Supp. 2d 1038, 1055 (E.D. Wis. 2005); 20 C.F.R. §§ 404.1513(d), 416.913(d);

SSR 06-03p, 2006 WL 2329939, at *1-2.  Although information from an "other source" cannot

establish the existence of a medically determinable impairment, it may be used "to show the

severity of the individual's impairment(s) and how it affects the individual's ability to function."

SSR 06-03p, 2006 WL 2329939, at *2; *see Koschnitzke v. Barnhart*, 293 F. Supp. 2d 943, 950

(E.D. Wis. 2003).

"[T]he adjudicator generally should explain the weight given to opinions from 'other

sources,' . . . when such opinions may have an effect on the outcome of the case." SSR 06-03p,

2006 WL 2329939, at *6; *see Masch*, 406 F. Supp. 2d at 1055 (stating that opinions from "other

sources" must not be ignored).  "[D]epending on the particular facts in a case, and after applying

the factors for weighing opinion evidence, an opinion from a medical source who is not an

'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,'

including the medical opinion of a treating source." SSR 06-03p 2006 WL 2329939, at *4.

Here, the ALJ penned four paragraphs pertaining to, at least in part, Ms. Lothamer's

records. (Tr. 26-27.)  Ultimately, however, the ALJ rejected Ms. Lothamer's statement in her

mental impairment questionnaire that Sneed would be absent two days a week and could stay on

task only 85% of the workday, finding it inconsistent with her treatment notes and other evidence of record. (Tr. 27.) The ALJ instead assigned greater weight to the opinions of: (1) Ms. Jones, Sneed's counselor, who indicated that he had difficulty being around people and that his symptoms were not related to cannabis abuse; and (2) Drs. Hill and Unversaw, the state agency psychologists, who stated that Sneed could understand, remember, and carry out semi-skilled tasks; relate on at least a superficial basis with co-workers and supervisors; attend to tasks for sufficient period of time to complete them; and manage the stresses involved with semi-skilled work. (Tr. 27-28.)

Sneed first argues that the ALJ erred by failing to acknowledge that the mental impairment questionnaire completed by Ms. Lothamer was countersigned by Dr. Varma, an "acceptable medical source."[8] (Reply Br. 3.) He urges that Dr. Varma's countersignature transforms Ms. Lothamer's opinion into a non-examining "acceptable medical source" opinion deserving of more weight under at least one of the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). Specifically, Sneed urges that Dr. Varma's specialty in psychiatry entitles his opinion to more weight than that of the state agency psychologists.

Significantly, Sneed does not contend, nor does the record reflect, that Dr. Varma ever examined or treated him, or that Ms. Lothamer consulted with Dr. Varma in making her assessment.[9] It appears, rather, that Ms. Lothamer's mental impairment questionnaire "simply

---

[8] Sneed does not dispute that Ms. Lothamer as a nurse practitioner is not an acceptable medical source. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (listing acceptable medical sources); SSR 06-03p, 2006 WL 2329939, at *2 (stating that nurse practitioners are not "acceptable medical sources").

[9] The Seventh Circuit Court of Appeals has explained that a physician does not become a treating source simply because a nurse-practitioner fills out a form "in collaboration with a supervising doctor." *Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010) (unpublished) (concluding that where there is no evidence that the physician "ever examined [claimant]–let alone treated him[,]" he is not considered a treating source opinion); *see Elliot v.*

had to be countersigned by either a physician or psychologist, and therefore, [Dr. Varma] counter[]signed the document." *Elliot*, 2014 WL 1018053, at *3; *see Cooper v. Astrue*, No. 1:06-cv-1175, 2007 WL 2904069, at *3 (S.D. Ind. Sept. 27, 2007) (rejecting claimant's assertion to treat a nurse practitioner's opinion that was countersigned by a doctor as a treating source opinion where there was no evidence the doctor saw the claimant or consulted with the nurse about the assessment).

"[D]espite the counter[]signature, the assessment is from [Ms. Lothamer], a nurse practitioner, and not an acceptable medical source." *Cooper*, 2007 WL 2904069, at *3; *see also Elliot*, 2014 WL 1018063, at *3.  As such, the ALJ was not required to give [Ms. Lothamer's] opinion any added . . . weight." *Elliot*, 2014 WL 1018053, at *3 (citing SSR 06-03p); *accord Cooper*, 2007 WL 2904069, at *3.  Therefore, the ALJ did not err in considering Ms. Lothamer's opinion as one from an "other source" rather than a non-examining "acceptable medical source.'

Next, Sneed challenges the ALJ's finding that Ms. Lothamer's mental impairment questionnaire was inconsistent with her own treatment notes. *See Clifford*, 227 F.3d at 871 (explaining that medical evidence may be discounted if it is internally inconsistent).  After making this finding, the ALJ cited as an example Ms. Lothamer's most recent note, December 27, 2011, reflecting that Sneed was pleasant and attentive with normal thought content, coherent thought form, and an euthymic mood, without memory problems, agitation, or anxiety. (Tr. 27 (citing Tr. 757-61)); *cf. Strobach v. Colvin*, No. 12 cv 50012, 2014 WL 1388285, at *12 (N.D. Ill. Apr. 9, 2014) (finding error where the ALJ discounted nurse practitioner's opinion because

_____

*Colvin*, No. 1:13-cv-90, 2014 WL 1018053, at *3-4 (S.D. Ind. Mar. 17, 2014) (holding that a physician's countersignature on a social worker's evaluation did not qualify it as a treating source opinion where the physician never saw the claimant or consulted with the social worker in conducting the evaluation).

of alleged inconsistencies without detailing what inconsistencies existed in the record).

In challenging the ALJ's finding, Sneed emphasizes that mental illness is "episodic" in nature, *Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006), and thus, the ALJ's citation to a single treatment note does not show inconsistency. He points to the vocational expert's testimony, indicating that an individual cannot sustain competitive employment if he misses even two days of work per month on an ongoing basis. (Tr. 69.)

But the ALJ cited to more evidence than just Ms. Lothamer's December 27th treatment note. Earlier in her decision, the ALJ discussed Ms. Lothamer's August 2011 initial evaluation, revealing a sullen mood and flat affect. (Tr. 26 (citing Tr. 698-700).) At that visit, Ms. Lothamer prescribed Cymbalta and assigned a GAF of 58 and diagnoses of major depressive disorder, recurrent moderate; and cannabis dependence. (Tr. 698-700.) And contrary to Sneed's assertion otherwise (Reply Br. 2), the ALJ also summarized Ms. Lothamer's November 2011 note, reflecting that Sneed reported Cymbalta had been helpful but he was having issues with anger. (Tr. 26 (citing Tr. 764-68).) At that visit, he had a cooperative but detached attitude, coherent thought form and normal but blaming thought content, no memory problems or suicidal or homicidal ideation, and fair judgment. (Tr. 683-87.) She assessed that he was "[s]lightly worse" and added Trileptal to his medication regimen (Tr. 766); the next month, Sneed told Ms. Lothamer that Trileptal had indeed leveled his moods (Tr. 757).

Thus, the ALJ considered whether Ms. Lothamer's mental impairment questionnaire concerning absenteeism and staying on task was consistent with her treatment notes (and that of her Park Center colleagues) as a whole. Ultimately, the ALJ's assessment that "[the] Park Center records show good response to medication and therapy" is adequately supported by the

16

record. (Tr. 28.)

Moreover, the ALJ discounted Ms. Lothamer's mental impairment questionnaire for another reason–because she found it inconsistent with other evidence of record. (Tr. 27); *see Clifford*, 227 F.3d at 871 (explaining that medical evidence may be discounted if it is inconsistent with other evidence in the record). Specifically, the ALJ cited Sneed's visit to Dr. Perez, his family physician, in January 2012, at which Sneed denied any depression. (Tr. 27 (citing Tr. 718).) The ALJ noted that the same was true during Sneed's follow-up visit to a podiatrist later that month. (Tr. 27 (citing Tr. 728).) Thus, the ALJ was entitled to discount Ms. Lothamer's opinion that Sneed's depression and worry would result in absenteeism and difficulty staying on task where he denied depression at other physician visits. *See Zblewski v. Astrue*, 302 F. App'x 488, 493-94 (7th Cir. 2008) (discounting nurse's opinion because it was inconsistent with other medical evidence of record).

And although Sneed argues that the ALJ failed to minimally articulate how Ms. Lothamer's opinion "contradicts" Ms. Jones's May 2012 letter, which was assigned greater weight (Opening Br. 14-15), the ALJ never said that Ms. Jones's opinion contradicted Ms. Lothamer's. Rather, the ALJ explained that she assigned more weight to Ms. Jones's letter noting Sneed's difficulties with interpersonal interactions because Ms. Jones met with Sneed regularly and her letter was "consistent with her notes." (Tr. 28.) The ALJ observed that Sneed's interpersonal difficulties were also reflected in the state agency psychologists' opinions (Tr. 27), and accordingly, she limited his RFC to "brief and superficial contact with coworkers and supervisors; and no work with the general public" (Tr. 21).

In addition, Sneed seems to suggest that the ALJ should not have relied upon the January

17

and February 2011 opinion of the state agency psychologists because these psychologists never reviewed Ms. Lothamer's mental impairment questionnaire penned in April 2012. But Sneed provides no legal explanation why this results in the ALJ's improper reliance on the state agency psychologists' opinion. *See generally* 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i) ("State agency medical and psychologist consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical experts  who are also experts in Social Security disability evaluation.").

The ALJ expressly noted that Sneed's most recent visit to Ms. Lothamer was in December 2011 (Tr. 27), and thus, the ALJ obviously considered the timing of the medical evidence of record when assigning it weight. Notably, Sneed alleged a disability onset date of March 2005 in his October 2010 application, and his DIB insurance expired in March 2008; thus, the state agency psychologists' opinion was not untimely to the relevant period. *See Rasnick v. Astrue*, No. 1:11-cv-283, 2012 WL 3779124, at *14 (N.D. Ind. Aug. 30, 2012) (collecting cases and rejecting claimant's argument that the opinion of the state agency physicians should have been discounted because they did not review a later treating physician's opinion rendered several years after the claimant's date last insured).

And to the extent the state agency psychologists' opinion conflicted with that of Ms. Lothamer, the ALJ weighed the conflicting evidence, ultimately deciding which evidence to credit. This Court does not resolve evidentiary conflicts or reweigh the evidence. *See Young v. Barnhart*, 362 F.3d 995, 1001-02 (7th Cir. 2004) (rejecting the claimant's argument that the ALJ should not have assigned greater weight to an earlier mental examination than one conducted later in time, concluding that "[w]eighing conflicting evidence from medical experts . . . is

exactly what the ALJ is required to do").

In sum, "[a]n ALJ must only minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (citation omitted); *see Frame v. Astrue*, No. 1:11-cv-1062, 2012 WL 3637583, at *9 (S.D. Ind. Aug. 21, 2012) ("[G]iven the importance and relevance of the information reflected in records authored by other medical sources, the ALJ must articulate a reasonable basis for rejecting other medical source opinions, which basis is grounded in substantive evidence in the record."). Here, the ALJ satisfied this standard, and Sneed has failed to identify evidence that materially undermines the ALJ's reasons for discounting Ms. Lothamer's opinion concerning absenteeism and staying on task.

Therefore, because the ALJ provided good reasons for discounting Ms. Lothamer's opinion, the Commissioner's final decision will be AFFIRMED.

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Sneed.

SO ORDERED.

Enter for this 23rd day of December 2014.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

19